June Term,
1860.

GILLET
v.
PHELPS et al.

---

## GILLET vs. PHELPS and others.

Where, in an action by the vendee of goods against creditors of the vendor, who had seized the goods under writs of attachment, as the vendor's property, evidence had been given of facts tending to show that the sale was fraudulent as to creditors, an instruction to the jury that such facts, if proven, "were evidence of fraudulent intent," was liable to be understood by the jury as meaning that such facts, if proven, were *sufficient* evidence of such intent, and was, therefore, calculated to mislead them.

An instruction to a jury, "that the terms of a sale [which was partly on a credit of one and two years] were in part calculated to hinder and delay creditors; that the law presumes a man to intend that which must naturally be the consequence of his acts; and that if they were satisfied that at the time of the

sale the vendee had knowledge of the insolvency of the vendor, then his pur-
chase was fraudulent as against such creditors," was erroneous, because it
was liable to be understood as declaring that the vendee must be presumed to
have intended to delay the creditors of the vendor, if such was the effect of
his purchase, although it should not appear that he knew that the vendor was
insolvent; and because the facts referred to in the instruction, although indi-
cative of a fraudulent intent, should have been submitted to the jury, to be
considered by them, in connection with all the other evidence, in determ-
ining the intent of the parties.

June Term,
1860.

GILLET
v.
PHELPS et al.

Evidence tending to establish fraud, must be submitted to a jury in such a man-
ner as leaves them free to determine its effect.

The acts and statement of a vendor, before and at the time of the sale, are admis-
sible in evidence to show his fraudulent intent.

The intent of the vendor of goods to hinder and delay his creditors, does not affect
the title of the vendee, without proof that he had notice of that intent.

Where a sale of goods is sought to be impeached as fraudulent against the credi-
tors of the vendor, facts tending to show that the vendor procured the goods
from such creditors by false representations, with an intention to defraud
them, and that his vendee was aware of, and had participated in, that fraudu-
lent purpose, are admissible as circumstances from which, in connection
with other evidence, the jury may infer that such sale was made in execution
of the previous fraudulent design.

Where the vendee, before the creditors sued out their writs of attachment, offer-
ed to transfer the goods to them, if they would release him from his liabili-
ties for debts incurred by the vendor in the purchase of the goods (such lia-
bilities being much less than the nominal price which he had agreed to pay
for the goods), evidence of such offer was properly ruled out, as not tending to
establish the good faith of the sale.

ERROR to the Circuit Court for *Fond du Lac* County.

Trespass, by *Timothy L. Gillet* against *Phelps, Vedder* and
*Van Buren*, for taking a stock of goods. The defendants
pleaded severally the general issue, with a notice of justifi-
cation, which alleged that said stock of goods was taken as
the property of one George W. Gillet, under several writs of
attachment, issued at the suits of several firms which were
creditors of said George W., and of which firms the defend-
ants were members, and that said goods were, at the time of
such taking, the property of said George, and not of said
*Timothy*, who claimed the same under a sale from said
George, which was fraudulent as to creditors.

On the trial, the plaintiff proved his purchase of the goods
from said George W. Gillet, on the first day of November,
1853, at a price exceeding $7,000, which was the full value

thereof; his continued possession until the 17th day of December of the same year; the taking of the goods on that day by the sheriff, under the writs of attachment above referred to; their removal and subsequent sale by the officer, and the fact that, in such taking, the sheriff acted under the direction of the defendants. There was also evidence tending to show a concert of action among the defendants in suing out the writs of attachment, and in the proceedings thereon.

The plaintiff's witnesses also testified, that he paid for the goods at the time of the purchase, by assuming a part of the indebtedness of George W. Gillet for the same, to the amount of about $2,800; by paying in cash, for said George, $118; by executing to him promissory notes for the aggregate sum of $2,800 or $2,900, mostly payable in from one to two years, with interest after six months, and by conveying to said George certain lands, and transferring to him several real estate and chattel mortgages; and that the indebtedness thus assumed, the mortgage debts thus assigned, and most of the notes thus given, had been paid.

The defendants introduced evidence of acts and statements of George W. Gillet, tending to show that he was insolvent at the time of the sale of said goods, and that the sale was made with the design on his part of hindering and defrauding his creditors; to which evidence the plaintiff's counsel objected, on the ground that it was not shown, or offered to be shown, that the plaintiff was cognizant of the facts; but the objection was overruled, and the plaintiff excepted.

The defendants also called as a witness, one Fenton, of the firm of Fenton & Phelps, New York, who testified to certain representations made to said firm in the city of New York, in May, 1853, by George W. Gillet, to induce the said firm to sell him goods. His testimony was as follows: "He [George W. Gillet] represented that, by the wish of his uncle, [the plaintiff] he was going to Fond du Lac; that his uncle offered him some inducements; had a store he would rent him cheap, and would assist him; that he had also an authority from the plaintiff to draw on him for $1,500, at six months, which would be paid when due, and would be capi-

tal in his business; that he should not have to provide for it himself; that before he came to New York again, his uncle would be partner in the business; that his uncle had promised to be a partner; that his uncle was worth $25,000; that he should be prepared to pay before he sought to buy again, although it would not be due; that his business would warrant it. I sold him goods on the faith of these representations. I next saw him in August or September following. I saw him alone. He proposed to buy goods. I asked him if he was prepared to pay. He replied he was not; that he had not thought it necessary; that his situation was such he thought I would not require it; besides, that the bill was not due. I then asked him if he had formed the partnership with his uncle. He said he had not; that his uncle was then in New York; was going into the banking business; and could render him more assistance in that capacity than to be a known partner in his business. I told him I would not be satisfied to sell him more goods, while he owed me so much money. He said his business had been prosperous and he had made money, and he would have no difficulty in meeting his payments; that he would bring his uncle in and introduce him, and he had no doubt that, after an interview, I would sell him more goods. The same day, or the next day, he brought his uncle into the store and introduced him. I related in their presence all the conversation I had had, as to his means, copartnership, &c., and plaintiff assented to it. He said it was all right; that George was doing well, and any goods that he bought would be paid for. I don't recollect that he said anything about copartnership. He assented generally, and said that he could be of more service as banker than as partner. I declined to sell. Plaintiff said George was responsible, and the payments would be promptly met. He said his letter of credit would be promptly paid when due. The acceptance and bill of goods, I believe, both fell due in November. I did not sell him any more goods. I don't know of any other purchases made by George at that time on credit. I heard him say he was buying of Wagstaff & Vedder about $1,600, and of Davis, Byrne & Johnson $600 or $700, and that the whole amount of his purchases

was $11,000 or $12,000. The acceptance of the plaintiff was not paid at maturity." To all this testimony the plaintiff's counsel objected, but the objections were overruled, and the plaintiff excepted. On cross-examination, the witness said: "I sold George partly on his letter of credit, and partly on the statement as to his ability to pay. I never sold him any goods on the plaintiff's representations. All the goods were sold prior to my acquaintance with the plaintiff. Plaintiff did not tell me he was going in as a partner, nor that the letter of credit was going in as capital."

One Ogden, a witness for the defendants, also testified as follows: "I was at Fond du Lac on the last days of October and first of November, 1853; am an attorney at law; had a claim against George W. Gillet; called on him on Saturday; saw plaintiff in the store; George occupied plaintiff's store; George said he was doing a good business, and would in a short time be able to pay the claims I had against him; plaintiff was in the store at that time; had another conversation the same day; left for home Tuesday; spoke with the plaintiff about a letter of credit for $1000 he had given George; he knew my business, and that I was pressing George; George offered me plaintiff's notes, which I refused, without a mortgage; George said he would not give a mortgage, but still offered notes, which I refused, and said I would go home and sue. At one conversation plaintiff was in hearing, but can't say as to the other times."

There was also evidence tending to show that at the time of Ogden's interview with the plaintiff and George W. Gillet, the sale of the goods to the former had been the subject of negotiation, and that the invoice and other papers relating thereto were then being made.

The plaintiff re-called James M. Gillet, one of his witnesses, and asked the following questions: "State whether, prior to the attachment, you had any conversation with Phelps & Vedder, with reference to the fairness of the sale on the part of the plaintiff. If so, state what they said." Objection by defendant sustained, and plaintiff excepted. Question. "What offer, if any, did the plaintiff then make to the defendant *Vedder* to transfer this stock of goods to

him, provided he would relieve him from his liabilities for George W. Gillet?" Objection by defendant sustained, and plaintiff excepted. The same question was repeated with a substitution of "the defendant *Phelps*" for "the defendant *Vedder*," and was ruled out, and the plaintiff excepted.

The court, among other things, instructed the jury as follows: "That if they believed that G. W. Gillet made the representations to Ogden, sworn to by him, on the 29th and 31st days of October, 1853, and that the plaintiff was present and heard the same, and sanctioned the same, or did not dissent therefrom, and that, in fact, the sale to the plaintiff had then been negotiated, and that an invoice was being taken, and the deed of the lots made, the same evening that Ogden last called—it is evidence of fraudulent intent on the part of the plaintiff."

The court further instructed the jury as follows: "That the terms and conditions of the sale were directly, in part, calculated to hinder and delay creditors, and the law presumes that a man intends that which must naturally be the consequence of his acts; and if the jury are satisfied that, at the time of said sale, the plaintiff had knowledge of the insolvency of George W., then he was a fraudulent purchaser of said goods, as against the creditors who attached said goods." To all these instructions the plaintiff excepted.

Verdict for defendants. Motion for a new trial denied, exception taken, and judgment on the verdict.

*Ed. S. Bragg*, for plaintiff in error:

1. Evidence of the insolvency of the vendor was admitted, although there was no proof or offer of proof at the time, to charge the plaintiff with knowledge of such insolvency. This is cause for reversal. 2 Hill, 447; 19 Wend., 232; 16 id., 64; 2 Hall, S. C., 42. 2. The declarations of Geo. W. Gillet, sworn to by Fenton, were inadmissible, because they were "the declarations of a third person, not a party to the suit, and who was himself a competent witness." *Persons vs. Burdick*, 6 Wis., 63; and because the defendants had affirmed the contract made with plaintiff's vendor, by bringing suit upon it, and were thereby estopped from alleging fraud in that contract, to vitiate the title of third parties. 1 Doug.

June Term,
1860.

GILLET
v.
PHELPS et al.

(Mich.), 330; 24 Wend., 86; 1 Denio, 69; 13 Barb. (S. C.), 641. 3. The court erred in ruling out the questions put to Jas. M. Gillet. It erred, also, in its charge to the jury, in stating, as matter of law, that certain facts were "evidence of a fraudulent intent" (1 Chand., 40; 3 id., 240), and in assuming that the plaintiff's vendor was insolvent, both of which were questions of fact for the jury; and in holding that a man who hears a false statement of his debtor to a rival creditor without dissent, is guilty of a fraud, which vitiates securities for his own debt, then being perfected.

*Chas. A. Eldredge*, for defendants in error:

1. · There was no evidence to establish a *joint* trespass, and therefore the action must fail. 2. The acts and declarations of plaintiff's vendor were admissible to show that the sale was made with an intention, on his part, to defraud his creditors. The testimony of Fenton shows that the false representations of George, in· the purchase of the goods, were adopted by the plaintiff, and connects him with the fraudulent design in that purchase, which was consummated in the sale to himself. Their declarations give character to their acts, and show them to be *participes criminis. Crary vs. Sprague*, 12 Wend., 41; *Waterbury vs. Sturtevant*, 18 Wend., 359; *Apthorp vs. Comstock*, 2 Paige, 488; 1 Greenl. Ev., p. 136; 12 Vt. R., 519. 3. The acts and representations referred to in the first instruction, to which exception was taken, were "*evidence* of a fraudulent intent," although not *conclusive evidence* (Roberts on Fraud. Con., 569); and the terms of the sale manifestly tended to hinder and defraud creditors, as stated in the second instruction.

July 30.          *By the Court*, PAINE, J. We think that the judgment in this case must be reversed, for the reason that the instructions given by the court to the jury were calculated to mislead them, and might have prejudiced the rights of the plaintiff. The question was, whether the sale from George W. Gillet to the plaintiff was fraudulent. The first instruction appearing in the bill of exceptions, is as follows: "That if they believed that G. W. Gillet made the representations to Ogden, sworn to by him, on the 29th and 31st days of

October, 1853, and that the plaintiff was present and heard the same, and sanctioned the same, or did not dissent therefrom, and that in fact the sale to the plaintiff had been then negotiated, and that an invoice was being taken and the deed of the lots made out the same evening that Ogden last called, *it is evidence of fraudulent intent on the part of the plaintiff.*" Now we think this language is not only capable of being so construed, but would be commonly understood as meaning, not merely that the facts mentioned would be competent evidence, proper to be considered in determining the question of fraud, but would be full evidence of the fraudulent intent of the plaintiff, and such as would require them to find it as a fact. Most juries would so understand it. If the judge tells them that certain facts are evidence of another, they would understand it to mean sufficient evidence, and not merely material and tending to establish the other. Lawyers, acquainted with the rules of evidence and the different functions of the court and jury, might infer only the latter meaning. But we think a jury would naturally infer the former, and that for this reason the instruction may have prejudiced the rights of the plaintiff. For the effect of this evidence was for the jury and not the court to determine, and it should have been submitted to them in such a manner as left them free to determine it, and not in language implying that they were bound to give it a particular effect.

The judge gave also the following instruction, which was excepted to: "That the terms and conditions of the sale were directly in part calculated to hinder and delay creditors, and the law presumes a man intends that which must naturally result from his acts; and if the jury are satisfied that at the time of said sale, the plaintiff had knowledge of the insolvency of George W., then he was a fraudulent purchaser of said goods, as against the creditors who attached said goods."

We think this instruction is also liable to objection. It assumes things which should have been left to the jury, and only in connection with which assumption could the instruction be sustained. For certainly it will not do to say that the law presumes that every man who sells on credit and takes notes, does so with intent to hinder and delay his cred-

June Term, 1860.

GILLET
v.
PHELPS et al.

itors. If the property sold is all that he has, or if he is insolvent, then such terms of sale may indicate that intent, and they should be submitted to the jury in connection with the evidence upon the other points, as all to be considered in determining upon the intent of the parties.

There is another point of view in which the instruction may have prejudiced the plaintiff. The terms of the sale are agreed on by both the parties; it is the act of both parties. When the court, therefore, told the jury that the direct effect of it was in part to hinder and delay creditors, and that the law presumed that a man intended that which naturally resulted from his acts, they might apply it as well to the purchaser as to the vendor, and suppose that the law presumed that the purchaser intended to delay the vendor's creditors, because such was the effect of the terms of sale. It is obvious, however, that this principle could apply only to one having knowledge of the condition of the vendor's indebtedness. He himself must of course know it, and if he made a sale upon such terms as must hinder his creditors, he may be presumed to have had that intent. But it would not do to presume that the purchaser had that intent, because such was the result of his purchase, unless he knew that the vendor was so indebted as to produce such a result. It may be that the court intended this general language to apply only to the question of the vendor's intent, and that it was qualified with respect to the plaintiff, by the subsequent statement that "if he knew of the insolvency of George W. then he was a fraudulent purchaser," &c. If so, it would not be liable to this objection; but we think the distinction between the intent of the vendor and that of the purchaser should be more clearly marked in a case of this kind; for whatever may have been the facts in this case, it is undoubtedly true that the rights of purchasers frequently depend entirely upon the observance of that distinction.

We have no doubt of the admissibility of the acts and statements of George W. Gillet, which were offered for the purpose of showing his fraudulent intention. Whenever the intent of any man, in doing a particular act, is in question, his statements and acts with reference to it, at the time,

and certainly those preceding the time, are original evidence for the purpose of showing his intent. The authorities cited by the defendant in error, fully establish this proposition. And it results from the necessity of the case, as there is no other mode of proving intention. It stands upon the same grounds with the question of the bodily or mental feelings or sanity of any person. Greenleaf's Ev., vol. 1, §§ 102, 110.

Nor do we think there was any error in admitting the evidence of Fenton as to the statements of the plaintiff in New York, in relation to the previous representations of George W. Gillet, at the time he purchased the goods. The counsel for the plaintiff in error urged that those statements, made long after the sale, could not possibly have induced the sale. That is very true, and would have been a good answer to an action against the plaintiff for falsely representing George W. to be responsible. Yet, although these statements could not have induced the sale to George W., yet if that sale was induced by the same and other false representations, made by George W. himself, for the purpose of obtaining the goods and then defrauding his creditors, and these subsequent statements by the plaintiff were sufficient to satisfy the jury that he was aware of and participated in the original purpose of George W., that would strongly tend to impeach the good faith of the sale from George W. to him, and go to show that it was simply an execution of the original design. The statements were not offered to show that they induced the sale to George W., but to show, in connection with other evidence, a fraudulent design on his part in procuring the goods, which was aided by the plaintiff, as circumstances from which the jury might infer a continuation of the fraudulent intent, and knowledge of and participation in it by the plaintiff. We have no doubt it was competent evidence for this purpose.

Nor do we think there was error in rejecting the evidence of the plaintiff's offers to transfer the property to the defendants, if they would relieve him from his liabilities for George W. Gillet for the goods. We should doubt the tendency of such an offer, even if shown, to establish the good faith o the sale. For if it had been made in good

faith, and the plaintiff had paid divers other valuable considerations in addition to his "liabilities for George W. for the goods," it is not according to the ordinary action of human nature, that he should transfer the whole stock, merely in consideration of being relieved from those liabilities. But such an offer seems to be more in the nature of a wager of a man's present good faith, than as having any real bearing upon the question, whether he previously had knowledge of a fraudulent intent on the part of his vendor.

But we are inclined to think that the evidence of the statements of *Phelps* and *Vedder*, with respect to the fairness of the sale, were admissible. It was said that these statements were made immediately after the transaction, and when they were ignorant of the evidences of fraud, and that they may have assented to the fairness of the sale from motives of policy, &c. This may all be very true, and might be urged before the jury in such manner as to destroy the effect of the evidence. But it goes to its effect, not to its admissibility. The admission that a sale was fair is rather the admission of a general conclusion, than of any distinct fact. Yet we are unable to take it out of the general rule which admits the statements of parties with reference to the transactions in question between them. Of course their admissions would not affect the rights of the other defendants, but would be evidence only as *against* *themselves*.

There was some evidence tending to show that the defendants were acting in concert in attaching the goods. If that was so, which was for the jury to say, we think they were jointly liable, if liable at all, although their debts were separate.

The judgment is reversed, with costs, and a new trial awarded.